We're asking the court to reverse the summary judgment of the trial court and remand the case for trial because there's ample evidence of a question of fact that Joe Alviar's disability, his PTSD, was a motivating factor in Macy's decision to terminate him. As Dean Frank Newton often would say, the law is a seamless web, and that web catches a question of fact in this case. There's ample evidence that Joe Alviar was a high performer. Macy's own performance evaluation indicated just prior to him disclosing that he had PTSD that he had solid meets expectations, that he had one of the highest performing stores in the district, that in March and April of 2015, his store was identified as the store of the month, and that he had high performance numbers for a store that had a lot of shoplifting and other risk management activity for which he was responsible. It is undisputed that Joe Alviar, through his service to this country, three deployments overseas, developed post-traumatic stress disorder. He was deemed to have PTSD by the VA at 50 percent, and the Americans with Disabilities Act signed into law in 1990 by President George H.W. Bush, and then the Americans with Disabilities Amendments Act of 2008 signed by George W. Bush, at the time heralded as a law that would provide protection for returning veterans with conditions just like PTSD, provides protection for a disability just like this. Under our federalism, the Texas legislature passed the protection for disabled employees, and they actually provided an even lower standard of liability that an employee only show that the disability was a motivating factor. Under federal law, courts, the Fifth Circuit, even the U.S. Supreme Court, has held that the standard for showing disability discrimination, age discrimination, and retaliation is a but-for standard, but under the Texas statute, the standard for disability discrimination is a motivating factor. In addition to the evidence of his performance, the overwhelming evidence of pretext in this case calls for a question of fact. Justice Scalia in St. Mary's Honor Hall indicated that a fact finder's disbelief of the reasons put forward by the defendant may, together with the elements of the prima facie case, suffice to show intentional discrimination. It doesn't require a factual finding of discrimination, but Justice Scalia said as early as 1993 that it was sufficient to establish discrimination. And in this case, the Macy's even said, at page 27 of their brief, the major problem with Joe Alvear's performance was discovered in August of 2015, right before his termination, regarding a supposed failure to follow criminal prosecution guidelines. Well, the problem with that is, one of his subordinates that was interviewed by his supervisor, Auden Benavides, made it very clear that what Mr. Lillard put forward regarding Mr. Alvear's performance was just false. And then, shortly after providing a statement that was used in the TWC, that statement was aware of it, but in fact, Macy's was aware of it at 776, in the record site 776, and other record sites, Lillard actually was aware of the statement that Mr. Benavides filed, and then shortly after filing that statement, he was subjected to an adverse action, and that meets the prima facie case. So, we have good performance. We have a showing that the major problem that Macy's identified was false, as provided by Auden Benavides, a third-party witness. We have evidence that that third-party witness, shortly after providing a statement in support of Mr. Alvear, was retaliated against. And we have evidence of, after an indication that Mr. Alvear disclosed his PTSD, that Mr. Lillard asked him, are you really sure you can handle the stress of the job of the Irving store, in context of discussing his PTSD, even after the Irving store had been identified as the store of the month in the district in March and April of 2015. In addition, Mr. Lillard indicated that he didn't like that Mr. Alvear had a flat affect that was a condition of, or a side effect of, the medication he took for his PTSD. This evidence shows Mr. Lillard's hostility to the PTSD condition. And the legislative history is replete with references that the Americans with Disabilities Act and the amendments are not only aimed at trying to make sure employees with disabilities have reasonable accommodation, but it is aimed at combating wrong perceptions of disabled people and wrong perceptions that they can be productive employees. Let's assume that you establish a prima facie case. Their brief, Macy's brief, starts, gets a pretty detailed account of, apparently documented in his file from October of 2014 through August of 2015, the deficiencies, very specific deficiencies that he admitted were problems. And he said, I'm not doing what I should be doing. I failed to do this. I'm going to fix it. I'm going to fix it. And I would go back and have another meeting with him and talk about the deficiencies. And he would admit that there were problems. And then, apparently it's documented, it doesn't seem to be, it's contested that he failed to perform certain things that were required, the walk through to the fine jewelry stores. His people weren't documenting when they had physically retained people with probable cause facts that Macy's was very concerned they were going to get sued over. So, in the face of that evidence, where do you get pretext? Auden Benavides. Macy's identifies the identification in August of the supposed failure to follow criminal prosecution deadlines as the major problem. And one can infer from their own position that that is the major problem on page 27 of their own brief. That Auden Benavides directly contradicts Lillard's testimony regarding that and what Lillard put forth as the reason to testify. So, while they identify performance deficiencies going back to August of 2014, it's not unusual in a performance evaluation for an employee to have good comments and bad comments. Some of these sounded pretty serious to me, at least. And if he's the supervisor of security in all of this and it wasn't just one or two things, it was a laundry list every time. And he would admit that I failed, I failed, I didn't do it. Partly, I would, well, I think the important thing is that Macy's doesn't identify it being a major problem until August of 2015 in their own brief. They're the ones that indicate the major problem is in August of 2015. And I would, I would submit that while they had criticisms going back to August of 2014, they also had praise. He had store of the month for March of 2015 and March of 20, and April of 2015. What does that mean, store of the month? That he had the highest number of apprehensions. He had the highest number of folks that were apprehended for shoplifting that were exceeding in multiples of other apprehensions. Wasn't he downgraded because he didn't counsel with his detectives or he didn't decide to prosecute as many people as he thought he should? Well, part of the problem was his, he had over 100 folks that he had apprehended. And while other stores had dozens, he had a very large docket. And so that was part of the problem why he couldn't get everyone prosecuted. But even Auden Benavides pushes back with his testimony and his statement that the way Mr. Lillard characterized Mr. Benavides' performance was just not accurate. And this is not a case of just Mr. Alvear putting forward that I did a good job or I applied. This is one of his subordinates who came forward and said that someone that he still worked for at the time was just not telling the truth with regard to the performance that Mr. Benavides, with what Mr. Alvear was doing. And were both he and Benavides at the plaintiff here, were they under Willard? Yes, both of them were. And it was Benavides that came forward and said what Lillard is saying about Alvear's performance with regard to the criminal prosecution guidelines is just not accurate with regard to what our team is doing. And that, that is what Macy's itself identifies. That whole incident is what Macy's identifies is the serious problem, the major problem at page 27 of their brief. So while they like to try to paint him as a bad employee and they don't take into account the fact that he had solid meets expectations evaluation in the spring of 2015 and he had score of the month in March and April, he was a high performer. And while he had some deficiencies, according to Macy's own brief, the serious problem wasn't until March of 2015 and Benavides proves that what they claim was a serious problem, what Lillard tries to say is a serious problem, just wasn't the truth. And from that, there is at least a question of fact whether Alvear's disability was a motivating factor. The U.S. Supreme Court in Reeves v. Sanderson-Plumbing and in St. Mary's Honor Hall, Justice Scalia tells us that the prima facie case, along with some evidence of pretext or the fact that the stated reason for the termination is unworthy of credence, is to be examined. And in this case, we've set forth, and in fact the Fifth Circuit has held that the appropriate prima facie case is set forth in Milton v. Texas Department of Corrections of this court, that's at 707 F. 3rd 570. And under that holding, Alvear has to show that he had a disability, that he suffered an adverse action, that he was replaced by someone who didn't have a disability, and he did that. And along with evidence of pretext, which we have, Auden Benavides and the performance of Alvear and their own admission that the serious problem didn't occur until August of 2015 that Benavides rebuts, and the comments of Lillard regarding Alvear's PTSD condition, all of that evidence creates a question of fact under the lower standard provided by the Texas statute that the disability was a motivating factor. We would urge the court to reaffirm their finding of what the prima facie case was in Milton v. Texas Department of Corrections. It was a correct, eerie guess. This court only need go back to the 2005 case of the Texas Supreme Court in Isleta ISD v. Menares that sets forth what a prima facie case is under a motivating factor analysis for the different protected categories. There is some confusion in the case law, and I think that confusion arises because of the difference between the Texas statute, which requires motivating factor analysis for a but-for test, and a lot of courts, because there is even guidance in the Texas statute that they're to follow federal law, don't take into account the difference in the language used. The motivating factor language, I think, compels what the Fifth Circuit said was a prima facie case in Milton. Finally, there is a sham affidavit question. Lillard said one thing in his affidavit and another thing in his testimony. They are moving for summary judgment. It is their burden. The sham affidavit doctrine has been applied to folks trying to create a question of fact, but when someone is trying to dismiss Joe Alvear's case, they certainly should be held to the same standard and not be allowed to do that with a sham affidavit, unless the court has any questions. Thank you. May I please call on Michael Christman for the Appelees, Macy's and Macy's Retail Holdings. I want to make sure I address all the points that Mr. Smith just raised, and I want to make sure I do it in an appropriate order. We addressed the sham affidavit issue pretty thoroughly in our brief. We believe the sham affidavit rule does not apply, as the district court held. This is a rule that applies when you're trying to defeat summary judgment, not to enforce it. In any event, it was not a sham because, as we showed, the reasons in the declaration and the reasons in the deposition that he identified were consistent with each other, so there was not a sham. With regard to Mr. Alvear's case, Mr. Smith did not address the issue of direct evidence. We believe there is no direct evidence. Mr. Lillard's comments that Mr. Smith identified were raised sufficiently in advance of the termination, and he, in fact, was not responsible for the termination. He was in on the decision. He was, and he provided information, but he did not make the decision himself. I thought he was consulted. He was. He absolutely was. But there's no evidence that Ms. Bachman and Ms. Atkins, who actually did make the decision, were even aware of those comments, which we dispute were even indicative of any type of discriminatory animus at all. Are you saying it's undisputed who made the decision? I thought the briefing at least indicated that several people maybe have been involved in the discussion and who actually said pull the trigger maybe is one thing, but who influenced the decision. Is that disputed? No, Your Honor. There were five people involved in the discussions about the termination. Two of the, two of those individuals were, actually made the decision to terminate. The other three were simply consulted on for information related to that termination. Mr. Lillard did not make the decision. He was consulted. And as a supervisor, you would expect him to be consulted because he would have the most information. So that's not disputed. But in terms of direct evidence versus circumstantial, direct requires you not, you can't make inferences or any leaps of any kind. And to do that here, you would have to make leaps with regard to those alleged comments which occurred in April versus the termination which occurred in August. So we don't, it's not direct evidence. Well, the favorite part of your brief that we heard from the other side is page 27, where you wrote the most serious problem surfaced in early August, 2015. LVR's team violation of the criminal prosecution guidelines. How would you tell us to analyze your statement there? Why is that the most serious problem? And how does it affect that it only arose in August of 2015? I didn't hear the last point, Your Honor. Well, just how do you respond to the argument from the other side that your acknowledgment there that the most serious problem did not arise until August 2015 undermines these earlier events that you're talking about? Well, the most serious problem wasn't discovered until August of 2015. I'm sorry, what? It wasn't discovered. The most serious problem was not discovered. It had actually been occurring before that. What was that problem? The problem was Mr. LVR's team's violations of the criminal prosecution guidelines, which Mr. LVR admitted. So all this discussion about Mr. Benavidez and him supposedly saying that they didn't violate the prosecution guidelines is wrong. Mr. LVR repeatedly admitted that they violated those guidelines. He repeatedly admitted that he allowed his detectives to make those prosecution decisions on their own, which is an absolute violation of those guidelines. It's clear. So Mr. Benavidez, he can talk about what maybe he did or didn't do. He can't talk about what anyone else did. Mr. LVR admitted it repeatedly. So it really should not be disputed that that did occur. Mr. LVR doesn't dispute it. So nobody else should. What Mr. Benavidez has to say about this really doesn't matter, because what matters is what Mr. LVR admitted to. There were five people that I thought he agreed that five people prosecuted without his input. There were five, at least five instances in which the detectives... In fact, were all those Benavidez or were there other people? I'm not sure Mr. Benavidez actually did it or not, to be honest. But I know... How can you say Benavidez can't talk about the other people? Who were the other people? There were two other detectives that were involved. And it's evidence undisputed that those two detectives made prosecution decisions without supervision or consulting Alvarez. That's my understanding. But in terms of... I don't believe just one of them did all five or more. I believe that at least two of them did it. I mean, I can't... I'd have to look through the record to point to exactly who did what and when. But what we do know is that Mr. LVR admitted that they did do it on at least five occasions. But who was they? The two detectives. Benavidez and somebody else. We believe it... I'd have to look to see if Mr. Benavidez did it or not. But Mr. Green, and there's a third one identified in the brief as well, who also prosecuted without getting Mr. Alvarez's consent. And that's the most serious issue. It's not the only issue, as Mr. LVR identified. But it's more serious because it subjects us to a potentially serious liability. That's why we have that rule. And you can't just go around doing whatever you want. Mr. Alvarez didn't even know what that... Preventing that type of liability. So it's something that we have to enforce. And it's unfortunate, but we cannot have an asset protection manager, regardless of anything in his personal life, doing or allowing his detectives to make those types of decisions on their own. Is there any issue in this case that's been argued by the other side about reasonable accommodation that Macy should have been responding to this in some way other than terminating him? Is there a reasonable accommodation issue in this case that has been raised either factually or in some other as argument? First of all, he did have a reasonable accommodation claim that he did not pursue an appeal. In terms of... Second of all, in terms of what Mr. Lillard did, Mr. Lillard spoke to Mr. Alvarez about accommodations. Mr. Alvarez told Mr. Lillard and at least Ms. Atkins that he did not need an accommodation. He told Ms. Atkins that if he needed one, he would come to her and ask for one. So in terms of an accommodation, the possibility was there. Mr. Lillard even asked Mr. Alvarez if he wanted to go to a smaller store, one that didn't have the type of loss prevention problems that the Irving store has. Mr. Alvarez said that he was 100% committed to that store. The day afterward, he said that. So he had the opportunity, but he chose not to pursue it. He could have gone at any time and asked for a reassignment if he felt he couldn't handle that store. And there are smaller stores that he could have gone to in the Dallas-Fort Worth area, but he wanted the Irving store, which is fine. But he has that obligation to go back as part of the interactive process and tell them, I changed my mind. I do need an accommodation. In terms of the prima facie standard that Mr. Smith spoke about, this court and LHC group went through it pretty exhaustively in terms of what is the appropriate standard to use in a disability discrimination case. And it is used that standard repeatedly for both ADA and Texas Labor Code claims on disability discrimination. Moss v. Harris County, Constable Precinct 1. Dillard v. City of Austin. And DeLaval v. P-TECH Drilling Tubulars. And Durack v. Safety Vision, LLC. All three of those are both Texas Labor Code claims, and all three of those use the standard identified in LHC group, the one that goes back to a case in this court back in 1991, 1992, I believe. The standard used by Mr. Alviar that he identified in Milton and in Isleta, the Texas case, is the incorrect standard as identified in LHC group. That's the standard that was originally used by this court in Daigle. I'm sorry, in, yes, I'm sorry, Daigle v. Liberty Life Insurance in 1995. The court in LHC made clear that that is the, that that's not the right standard. The district court in this case actually used a standard from a 2009 case, EEOC v. Chevron Phillips, even though the district court thought it was applying the standard proposed by Mr. Alviar. But the court, this court in LHC group said that, too, is the inappropriate standard to use. And, in fact, the appropriate standard to use is the LHC group standard. The U.S. Supreme Court impliedly blessed that same standard that this court talked about in LHC group in Raytheon Company v. Hernandez. JUSTICE SCALIA. It doesn't seem to me the four-part test is really that much different. The other, it basically asks the same question twice in a different way. I don't know if it adds that much to the company's burden in response or to the plaintiff's burden in proof. I don't know if you disagree with that, but it's basically asking about causation twice, it seems, or at least related question causation twice. MR. HENRY. Your Honor, that's the Chevron Phillips standard, I believe, that you're discussing. And I think it does have that extra element on there. So, yes, it does not. I'm just, I want to make sure I'm articulating the appropriate standard to the court. So, and as we cited in our brief, there are a number of Texas cases that also rely on that same standard, point out that it is the appropriate standard to use. And there are several cases that I can identify for the court where they actually use the LHC group standard for a disability claim, disability discrimination claim, and then they use the standard identified by Mr. Smith from his letter or from Weaves or any other case like that for another type of discrimination claim. So in Stringer v. North Boulevard Consolidated School District, which actually just came out this year, this court used the LHC standard for disability discrimination and used a variation of the ISLATA or the DAGIL standard for a gender discrimination claim. In Davis v. City of Grapevine and Donaldson v. Texas Department of Aging and Disability Services, which we both, which we cited in our brief, the Texas courts used the LHC standard for disability discrimination, and then they used the DAGIL standard for, in one case was an age claim, and the other case was a rage claim. I'm sorry, a race claim. So the courts have used different standards in even the same cases, depending on the type of claim, which is consistent with the U.S. Supreme Court's discussion in McDonnell Douglas and in Texas Department of Community Affairs v. Burdine that the prima facie standard is not inflexible and can vary depending on the factual circumstances, or in this case, the legal circumstances. With regard to the prima facie case, there's no evidence linking this, the comments or anything else related to Mr. Alvear's PTSD and his termination. Mr. Alvear admitted or either admitted or did not dispute all the performance deficiencies that Mr. Lillard identified, including the violation of the criminal prosecution guidelines. He said he was deeply embarrassed in one instance by his performance deficiencies. This was, he said he was deeply embarrassed about the deficiencies that they had discussed before Mr. Alvear disclosed his PTSD to Mr. Lillard. This was back in April of 2015. And interestingly, with regard to Mr. Benavides and the discussion that Mr. Smith had, Mr. Alvear testified that Mr. Benavides and the others told John Lillard that they did not allow Mr. Alvear, or I'm sorry, they told Mr. Lillard that Mr. Alvear did not allow them to make prosecution decisions when Mr. Alvear admitted that they did. So somebody's not telling the truth here, and it's the detectives. Mr. Alvear also told Cynthia Grizzle, who was Mr. Lillard's boss, two days before his termination, that he wouldn't use his disability as an excuse or a justification for his performance. Mr. Alvear's admissions eliminate any possibility of any type of causal link between his PTSD and his termination. Going to the last part of the, the last part of the McDonnell-Douglas test, writing motivating factor and pretext. There's no evidence that his PTSD was a motivating factor in his termination. Again, he admitted to all these things, and there's no evidence that anything but those performance deficiencies was considered in his termination. Mr. Lillard even said that that was not considered at all in those discussions. And there's no evidence to the contrary. He, he, he admitted to, like I said, he admitted to a number of the, I mean, all the violations he admitted to or he did not dispute. So it's, it's, regardless of any, you know, his, his performance evaluation, which occurred well before all these discussions took place, were actually, you know, they were part of the prior year. So the performance evaluation Mr. Smith's talking about was for the year prior. And it was fine. It was a meets expectations. But it was for... Why did he go from such good reviews to, I mean, a whole string of needs improvement? What happened? What happened? And he seemed that he was doing everything well. And then starting in October of 2014, all these problems started being documented. I can't tell you, Your Honor. I don't know. I don't know. All I know is that Mr. Lillard identified them and was trying to correct them. He repeatedly counseled Mr. Alvear on those performance deficiencies. He asked him if he wanted to move to another store. Mr. Alvear refused any type of accommodation. He was having trouble. And the problem, some of the problems he was identifying, Mr. Lillard was identifying, Mr. Alvear wasn't able to fix. He wasn't able to or wasn't willing to. But they were repeated. And so they just, they just kept piling up. And it's, you know, it's unfortunate. But, you know, we do have to consider the potential exposure and risk to the store. And especially with the criminal prosecution. And I was just curious if there was any evidence as to why he'd done, these were not problems prior to 2014. I just, if there isn't any evidence, there isn't. There's no evidence in the record, Your Honor, that I'm aware of. But going to pretext, there's no evidence of any pretext that the decision was anything related to anything other than his performance deficiencies. Again, he, like I said, he admitted to all these things. There's no evidence that any other asset protection managers had these same problems and were not terminated, especially with the criminal prosecution guidelines. It's just, you just, you don't do it. What, have other people been terminated for this? I don't think anyone, I don't think anyone had violated those before. And again, there's no evidence in the record to indicate either way. But there's no evidence to show that Mr., that anyone had violated those and was not terminated. There's no evidence that any information that Mr. Lillard provided to the group was untrue. To Ms. Bachman and to Ms. Atkins, to the extent that, you know, everything that he said was supportive of that termination. And the decision that they made, the evidence shows, is based solely on that. There's no evidence to the contrary. With regard to Mr. Benavidez, Mr. Smith talked about his filing of a statement in support of Mr. Alvear after Mr. Alvear's termination. This occurred about two months afterward. And Mr. Benavidez believed that his filing of the statement was somehow connected to his, or that his reduction in hours was somehow connected to his filing of that statement. The person who reduced the hours was Mr. Ibarra, who was Mr. Benavidez's supervisor. Mr. Lillard had nothing to do with it. So there was, you know, there's no evidence to show that Mr. Ibarra had any knowledge that he filed the statement in support of Mr. Alvear, or that there was any connection whatsoever between the two events. Mr. Benavidez's subjective belief of this is insufficient to create any type of fact issue of any type of connection. He also has no, he can't testify as to what other people are doing. He's trying to testify that the other two detectives didn't violate the criminal prosecution guidelines, but he can't testify to that. He has no personal knowledge. And in fact, we know it's not true. Mr. Alvear admitted that the other detectives, or the detectives as a whole, were violating the criminal prosecution guidelines. I don't have anything further for this court. If the court has any more questions, I'm happy to answer them. Thanks, counsel. Thank you. If I could please the court. Joe Alvear was a sergeant when he was in the Army. And I think if you look at his interview by Mr. Lillard and when he's confronted and Mr. Lillard says, well, I've spoken to the detectives and you haven't been authorizing these criminal prosecutions, he takes them, he takes him as true, but Mr. Benavides, he talks to Mr. Benavides and counsel said Mr. Benavides didn't have any personal knowledge. Well, Mr. Benavides testified that he visited with the other detectives and they indicated to him that they'd never prosecuted cases without Mr. Alvear's approval. And Mr. Alvear taking Mr. Benavides, or Mr. Lillard at his word when he confronts him reminds me of my, my father was a sergeant at Letterman Hospital in 1940. And then after Pearl Harbor, he went to, was a flight cadet and he became a second lieutenant. And he said, I never realized as a sergeant, I could be so wrong. And as a second lieutenant, I could be so right. I think it's a question of Mr. Alvear taking him at his word, but Mr. Benavides, after he talks to Mr. Benavides, Mr. Benavides makes it clear we never were approving these prosecutions and that pushes back. I also think it's important that this Court clear up the prima facie standard. And I just don't, I think that courts have just, courts in these employment cases try to make it clear that they recognize the distinction between Texas law, which provides a motivating factor standard and federal law that provides a but-for standard with regard to ADA cases. I think as Judge Southwick pointed out, in this case, it doesn't really make a difference because I believe we meet either standard. But I think for the bar, I think it's important that that difference be cleared up. But finally, the U.S. Supreme Court tells us in Reeves v. Sanderson-Plumbing that it's really not the mechanical application of the McDonnell-Douglas analysis, but it's really addressing the ultimate question in this case, which is, is there a question of fact that Alvear's disability was a motivating factor in Foley's decision to terminate? I would submit to you that prior to Lillard being his supervisor, he was a solid meets expectations supervisor. Prior to Lillard being his supervisor, he had store of the month. And even a month after Lillard becomes his supervisor, he had store of the month. He discloses his PTSD condition to Lillard. Lillard doesn't dispute that he asked, can you really handle this store? And that he didn't like his flat affect that was caused by the medication he took for his PTSD. And then what they say is the major problem, Benavides squarely confronts and indicates that not only was that untrue with regard to him, but the other two individuals. All right. Their brief says that Mr. Alvarez was deposed and he admitted in his deposition that he failed to approve notification of the police by his detectives. He failed to review case reports and he failed to complete detective touch bases. I believe that, and you can, the record speaks for itself, but I believe Mr. Alvear said that he said that to Mr. Lillard. But then he also had a conversation with Benavides and then Benavides indicated, no, that's not the case. We always get approval from you. Remember, one of the problems that Alvear has is short-term memory loss. A fair reading of the record, he could have forgotten that he approved those prosecutions. We don't have any information one way or the other from the other detectives. Only what Benavides testified to were his conversations with the other detectives, and those conversations were not objected to. So we do have that evidence in the record. We don't have the other detectives. We don't have a testimony from the other detectives, but we do have Benavides' testimony at the record site 718 through 22 and 772 and 73. And because there is ample evidence that Alvear's disability was a motivating factor in the decision, just a question of fact, there's enough to go to the jury on this, and this disability, this PTSD is squarely a condition that the amendments of 2008 were aimed at protecting employees from discrimination on the job. And because Alvear was a good performer, this is not an employee who didn't perform for Macy's, at least until Lillard becomes his supervisor, we would ask the court to reverse the lower court decision and remand the case for a trial. Unless the court has any other questions, I'll sit down. Thank you, sir. We'll take a break. The court will recess for approximately a 10-minute break, and we'll take up the next case when we return, which we'll announce at that time. Thank you, sir. Thank you. Thank you.